769 So.2d 1029 (2000)
Dennis G. KAINEN, et al., Petitioners,
v.
Katherine HARRIS, as Secretary of State, Respondent.
No. SC00-1644.
Supreme Court of Florida.
October 3, 2000.
Bruce Rogow and Beverly A. Pohl of Bruce S. Rogow, P.A., Fort Lauderdale, Florida, for Petitioners.
Deborah K. Kearney, General Counsel and Kerey Carpenter, Assistant General *1030 Counsel, Tallahassee, Florida; and Tom Warner, Solicitor General, Richard A. Hixson, and T. Kent Wetherell, II, Deputy Solicitors General, on behalf of Attorney General Robert A. Butterworth, Tallahassee, Florida, for Respondent.
Joseph W. Little, Gainesville, Florida, for Harvey M. Alper, Joseph W. Little and Henry P. Trawick, Amici Curiae.
A.J. Barranco, Jr. and Kimberly L. Boldt of Barranco, Kircher, Voeglsang & Boldt, P.A., Miami, Florida; and Kendall Coffey and Manuel A. Diaz of Coffey, Diaz & O'Naghten, L.L.P., Miami, Florida, for Diaz Amici Curiae.
John K. Shubin of Shubin & Bass, P.A., Miami, Florida, for The Cuban American Bar Association, The Hispanic National Bar Association, The Black Lawyers Association, Inc., and The Florida Association for Women LawyersMiami-Dade County Chapter, Amici Curiae
John A. DeVault, III and Allan F. Brooke II of Bedell, Dittmar, DeVault, Pillans & Coxe, P.A., Jacksonville, Florida, for Former Presidents of the Florida Bar, Amici Curiae.
Maggie Moody, Council Director, Civil Justice Council, Florida House of Representatives, Tallahassee, Florida; and Thomas R. Tedcastle, General Counsel, Florida House of Representatives, Tallahassee, Florida, for The Florida House of Representatives, Amicus Curiae.
PER CURIAM.
Dennis G. Kainen petitions this Court for a writ of mandamus, claiming the ballot language for the local option vote required by article V, section 10(b)(3)a, Florida Constitution, is unclear and ambiguous and thus should be invalidated. We have jurisdiction. See art. V, § 3(b), Fla. Const.
Upon review, we find the ballot language provided by section 101.161(3)(c) and (e), Florida Statutes (1999), as amended by chapter 2000-361, section 1, at 4035-36, Laws of Florida., is not clearly and conclusively defective to warrant relief here. See Florida League of Cities v. Smith, 607 So.2d 397, 399 (Fla.1992) (no relief is possible unless the ballot summary is clearly and conclusively defective). Thus, the petition is denied.
It is so ordered.
SHAW, HARDING, ANSTEAD, PARIENTE, LEWIS and QUINCE, JJ., concur.
ANSTEAD, J., concurs with an opinion, in which SHAW and PARIENTE, JJ., concur.
PARIENTE, J., concurs with an opinion, in which HARDING and ANSTEAD, JJ., concur.
LEWIS, J., specially concurs with an opinion.
WELLS, C.J., concurs in result only with an opinion.
ANSTEAD, J., concurring.
I fully concur in the majority's conclusion that the ballot language is "not clearly and conclusively defective" so as to warrant judicial intervention. However, while the majority's straight-forward analysis is certainly complete within itself, it is important to re-emphasize the extreme caution that a court must exercise and the high hurdle that must be cleared before a court may act in cases like this.[1] We need only look at the rare instances in which this Court has actually acted to strike a ballot proposed by the Legislature in order to distinguish the circumstances presented here.
In Askew v. Firestone, 421 So.2d 151 (Fla.1982), former Governor Reubin Askew joined with Common Cause and the League of Women Voters, Inc., in petitioning the courts to remove from the ballot a proposed constitutional amendment that *1031 appeared to restrict lobbying by former office holders, but that actually would permit immediate lobbying by removing an existing ban on such lobbying.
In an opinion by Justice McDonald the Court expressed caution at the outset about the parameters for its review of the ballot language:
The Court must act with extreme care, caution, and restraint before it removes a constitutional amendment from the vote of the people. Nevertheless, it is clear and convincing to us that the ballot language contained in SJR 1035 is so misleading to the public concerning material changes to an existing constitutional provision that this remedial action must be taken.
Id. at 156. Relying on statutory restrictions and a long line of constitutional precedents, the Court in Askew found that the ballot title and summary failed to fairly inform the voters of a major consequence of the amendment, i.e., that the amendment would actually void the existing ban on lobbying.[2] Rather, the ballot title and summary were written in such a way that a voter would believe that by approving the amendment she was voting to restrict lobbying. As stated by Justice Boyd in a concurring opinion:
A person who may vote to adopt the amendment for the purpose of limiting lobbying by legislators will actually achieve directly opposite results in removing the present lobbying ban.
Id. at 156-57. The essential holding of the Court in Askew was that a change to the Constitution
must stand on its own merits and not be disguised as something else. The purpose of section 101.161 is to assure that the electorate is advised of the true meaning, and ramifications, of an amendment. A proposed amendment cannot fly under false colors; this one does. The burden of informing the public should not fall only on the press and opponents of the measurethe ballot title and summary must do this.
Id. at 156. Of course, section 101.161(1), Florida Statutes (1999), contains the statutory mandate that the ballot title and summary be in such clear and unambiguous language so as to give the voter fair notice of the decision she must make. See Miami Dolphins, Ltd. v. Metropolitan Dade County, 394 So.2d 981, 986 (Fla.1981).[3]
Similarly, in our recent decision in Armstrong v. Harris, 25 Fla. L. Weekly S656, ___ So.2d ___, 2000 WL 1260014 (Fla. Sept. 7, 2000), this Court followed the holding of Askew and found the language in a proposed ballot title and summary "preserving the death penalty" violated the fair notice requirements because the ballot summary failed to advise the electorate of the "true meaning, and ramifications" of the amendment. Among other flaws, we found in Armstrong that the ballot summary completely failed to inform the voters that the provision in the Declaration of Rights of the Florida Constitution protecting *1032 citizens from "cruel or unusual punishments" would be altered and reduced to provide protection only from "cruel and unusual punishments." In addition, the ballot summary failed to inform the voters that a myriad of potential punishments other than the death penalty would be substantially affected by the amendment.[4] In essence, we held that if Florida citizens are to be deprived of this important right they must be told so.
Hence, both Askew and Armstrong present clear-cut cases of flawed ballot summaries that violate fundamental constitutional safeguards as well as both the letter and spirit of section 101.161 which was enacted "to assure that the electorate is advised of the true meaning, and ramifications, of an amendment." Askew, 421 So.2d at 156. As Justice Shaw declared in Armstrong, a Florida citizen is entitled to vote "with eyes wide open" when asked to nullify an original act of Florida's Founding Fathers.

THIS CASE
The circumstances presented here and the ballot summary language involved are clearly distinguishable from the circumstances presented in Askew and Armstrong. Here, the Constitutional Revision Commission itself initially placed a constitutional amendment on the ballot whereby Florida voters would receive the local option of changing from an elective system to an appointive system for selecting trial judges. In fact, the ballot language chosen by the Legislature and challenged here actually mirrors the final language actually chosen by the Commission and placed on the ballot as a constitutional amendment authorizing voters in local areas to go from an elective system to an appointive system.
More importantly, it appears that the concerns expressed by the petitioners here simply repeat an earlier debate that took place between the Commissioners when they were deciding upon ballot language. Before the ballot language for this constitutional amendment was finally settled upon, ballot language proposed by a committee of the Commission stated: "Provides for future local elections to either retain current election of circuit and county judges or to choose merit selection and retention." Fla. Const. Rev. Comm'n Journal 227 (Mar. 23, 1998) (emphasis added). During the debate over this language, Commissioner Lowndes moved to amend and change this language, explaining:
It was suggested to me by Mr. Morsani, Commissioner Morsani, this morning that the people that worked in his shop wouldn't know what we were talking about if we said merit selection and retention. And after he said that, it occurred to me that we really needed to be more clear what we're talking about.[5]
Commissioner Sundberg responded:
Well, the problem is, it seems to me, that thisthat this will permit a characterization which might be detrimental to the passage of thisI'm just made uneasy by it. It doesn'tI'm not sure it fully explains. And I know a ballot language cannot fully explain it. I'm not sure this is an improvement. It seems to me it may work against the proposition.[6]
*1033 Commissioner Lowndes' proposed change was thereafter adopted by the Commission and the actual ballot summary was put before the electorate and approved in the November 1998 general election. The ballot summary actually submitted and approved by the voters stated:

Provides for future local elections to decide whether to continue electing circuit and county judges or to adopt system of appointment of those judges by governor, with subsequent elections to retain or not retain those judges; provides election procedure for subsequent changes to selection of judges; increases county judges' terms from four to six years; corrects judicial qualifications commission term of office; allocates state courts system funding among state, counties, and users of courts.
(Emphasis added.) As noted above, the language now proposed by the Legislature for the local option vote is not unlike the ballot language finally settled upon by the Commission. Hence, the language cannot be said to conflict with the Commission's own description of this issue in the ballot summary of the judicial amendment already approved.[7] Both focus on a choice between an elective or an appointive system. Because the wording is so similar it would be difficult, if not impossible, to conclude that the legislative summary is misleading.
The petitioners, much like Commissioner Sundberg, as advocates for a change in Florida's method of selecting trial judges, may have valid concerns that the ballot language does not clearly explain the merit selection and retention system that will now be offered to voters as an alternative to popular elections. However, those concerns alone provide an insufficient basis for this Court to intervene. Perfection is not required, and common sense suggests that no matter how the ballot language is worded there will always be those who fear the wording itself favors passage or defeat. This Court has no authority to redraft the ballot language, and, of course, this Court may not consider the merits of a ballot issue.
Finally, while everyone may have different views as to precisely how this question should be phrased, and whether it contains an adequate explanation of the alternative appointive system, it can hardly be asserted that the ballot language contains the serious flaws that this Court found in Askew and Armstrong.
For all of these reasons I concur in the majority's decision to deny the application for a writ of mandamus.
SHAW and PARIENTE, JJ., concur.
PARIENTE, J., concurring.
I concur with the majority and write to explain my reasoning. This challenge comes before this Court as a result of the November 1998 passage of article V, section 10(b)(3)a, of the Florida Constitution, a constitutional amendment proposed by the Constitutional Revision Commission ("CRC").[8] This amendment provides voters with the "local option" of deciding whether to select county court judges and circuit court judges by "merit selection and retention rather than by election" and mandates that the vote "shall" be held in the 2000 general election.
Article V, section 10(b)(3)a. did not contain a provision setting forth the ballot question to be used for the local option *1034 referendum. Consequently, in 1999, the Florida Legislature enacted section 101.161(3)(c) and (3)(e), Florida Statutes (1999), in order to place the local option question on the ballot in each county and circuit and to provide for the language of the ballot summary.[9]
Based on concerns that the ballot question language contained in the 1999 version of sections 101.61(3)(c) and (e) would not be understandable to voters,[10] the Legislature amended the ballot summary during the 2000 legislative session to provide:
"Shall the method of selecting circuit court judges in the ... (number of the circuit) ... judicial circuit be changed from election by a vote of the people to selection by the judicial nominating commission and appointment by the Governor with subsequent terms determined by a retention vote of the people?"
"Shall the method of selecting county court judges in ... (number of the circuit)... judicial circuit be changed from election by a vote of the people to selection by the judicial nominating commission and appointment by the Governor with subsequent terms determined by a retention vote of the people?"
Ch.2000-361, § 1, at 4036, Laws of Fla. The Legislature approved this amendment on May 3, 2000, and the amended legislation became law on July 1, 2000. On August 14, 2000, the petitioners filed the original mandamus action in this Court challenging the 2000 revision of section 101.161 on the grounds that the provision failed to provide fair notice to voters because it did not contain the words "merit selection and retention."
Section 101.161(1), Florida Statutes (1999), requires that "[w]henever a constitutional amendment or other public measure is submitted to the vote of the people, the substance of such amendment or other public measure shall be printed in clear and unambiguous language." Because the constitutional amendment itself is not placed on the ballot, it is essential that the ballot summary "give the voter fair notice of the decision he [or she] must make." Askew v. Firestone, 421 So.2d 151, 155 (Fla.1982). As we explained in Askew, the "wisdom" of a proposed amendment or other public measure is "not a matter for our review." Id. (citation omitted).
As we stated in Advisory Opinion to the Attorney General-Limited Political Terms in Certain Elective Offices, a "ballot summary may be defective if it omits material facts necessary to make the summary not misleading." 592 So.2d 225, 228 (Fla.1991). Two ways in which a summary may be clearly and conclusively defective are by "fail[ing] to specify exactly what [is] being changed, thereby confusing voters," or "giv[ing] the appearance of creating new rights or protections, when the actual effect is to reduce or eliminate rights or protections already in existence." Florida League of Cities v. Smith, 607 So.2d 397, 399 (Fla.1992). The focus of the judicial *1035 inquiry is on the accuracy of the ballot and summary.
I find that the ballot summary in this case is not misleading because it: (1) properly advises the voters of the change from the current method of selecting circuit court judges and county court judges; and (2) explains the method of merit selection and retention in a manner that is neither misleading nor ambiguous. Although the petitioners point out that the word "merit" is not used in the summary and that the Judicial Nominating Commission does not "select" but rather "nominate[s]" candidates for judicial office, the possibility of using different terms or a more complete explanation does not render this summary defective.[11] Thus, unlike in our recent decision in Armstrong v. Harris, 25 Fla. L. Weekly S656, ___ So.2d ___, 2000 WL 1260014 (Fla. Sept. 7, 2000), where the ballot title and summary failed to clearly explain the elimination of an existing substantive state constitutional right, the ballot title and summary in the instant case utilizes plain language in an attempt to promote voters' understanding of the ballot initiative and to provide voters with "fair notice." Askew, 421 So.2d at 155.
The language that the CRC chose for the ballot summary in 1998, which led to the adoption of article V, section 10(b)(3)(a), lends support to the conclusion that the 2000 ballot summary is not misleading. The ballot summary drafted by the CRC did not mention "merit retention and selection," but instead stated that the amendment "[p]rovides for future local elections to decide whether to continue electing circuit and county judges or to adopt system of appointment of those judges by governor, with subsequent elections to retain or not retain those judges." Fla. Const. Rev. Comm'n, Revision 7 Ballot Summary (1998). In fact, the CRC rejected using the words "merit selection and retention" because the majority of the CRC felt that the summary should instead include a "description of the process." Fla. Const. Rev. Comm'n, Transcript of Proceedings 86-87 (Mar. 23, 1998).
Finally, I address the question of the timeliness of the petitioners' challenge, which once again places this Court in a position of having to make a last-minute assessment of a proposed ballot summary. Certainly a resolution of the issue of whether the ballot summary is misleading before the election is vastly preferable to an after-the-fact challenge. However, as I stated in my recent concurring opinion in Armstrong, "currently no time limits or established procedures exist for a challenge to the ballot title and summary" in other than citizen-proposed constitutional amendments. 25 Fla. L. Weekly at S661, ___ So.2d at ___ (Pariente, J. specially concurring). I again join Justice Overton's repeated requests to "devise a process whereby misleading language can be challenged and corrected in sufficient time to allow a vote on the proposal."[12]Id.; see Askew, 421 So.2d at 157 (Overton, J., concurring specially); Advisory Op. to the Att'y Gen. re Tax Limitation, 644 So.2d 486, 497 (Fla.1994) (Overton, J., concurring specially); Florida League of Cities, 607 So.2d at 401-02 (Overton, J., dissenting); *1036 Evans v. Firestone, 457 So.2d 1351, 1356 (Fla.1984) (Overton, J. concurring specially).
HARDING and ANSTEAD, JJ., concur.
LEWIS, J., specially concurring.
I concur with the majority's view and write to outline the principles that should, in my view, be considered and applied in analyzing the present issues. First, the relief sought here is mandamus and as I suggested and reasoned in Armstrong v. Harris, 25 Fla. L. Weekly S656, ___ So.2d ___, 2000 WL 1260014 (Fla. Sept. 7, 2000), such relief is available only to enforce a right that is clear and certain which calls for mere ministerial application of the principle involved. See Florida League of Cities v. Smith, 607 So.2d 397, 399 (Fla.1992). Mandamus proceedings are not available to be used as a mechanism to establish the existence of a right previously unknown and unstated. It is from this procedural posture and standard that the analysis must commence.
Article V, section 10(b)(3)(a) of the Florida Constitution requires that a certain vote concerning the manner or method of selection of certain judges occur during the 2000 general election. Importantly, this recently amended constitutional provision does not provide the specific words to be utilized as a ballot question, nor does it attempt to explain or internally contain the precise meaning or process involved in this "merit selection and retention."[13] Thus, the form of the ballot question to be presented to the electorate must be either words selected directly and only from the constitutional provision itself or from something external. In either event, it is necessary for some source to actually form the ballot question to be submitted to Florida citizens.
I cannot conclude that the constitutional provision which requires a "merit selection and retention" vote to be held in the 2000 general election is self-executing as to the form of the ballot question. See Gray v. Bryant, 125 So.2d 846 (Fla.1960). Further, I do not believe that a two-step process of providing the explanatory summary ballot language as appeared in connection with the 1998 constitutional amendment vote (which produced the requirement for this vote), but providing absolutely no explanatory summary in connection with this year 2000 vote by merely lifting limited words from the amended constitutional section, is appropriate under existing law. In my view, although generated from multiple and different perspectives, fundamental Florida jurisprudence has developed to require that ballots be fair and provide sufficient information to enable the electorate to have fair notice of the decision to be made by the vote, whether the ballot contains a summary or the actual provision to be implemented. See Wadhams v. Board of County Commissioners, 567 So.2d 414 (Fla.1990); Askew v. Firestone, 421 So.2d 151 (Fla.1982); Hill v. Milander, 72 So.2d 796 (Fla.1954). Here, with the constitutionally mandated vote requiring implementation, section 101.161(1), Florida Statutes (1999), as amended by chapter 2000-361, § 1, Laws of Florida, along with its interpretive decisions become applicable.
I certainly agree with the position of the petitioners to the extent that the words and placement of words to be included or omitted from the proposed ballot question are not those I would have necessarily chosen, had that decision been within my jurisdiction or responsibility. Utilization and placement of the word "selection" along with the omission of the words "merit selection" are legitimate criticisms. However, that is not the issue to be decided by this Court. Most assuredly, the ballot question should include the concept of a methodology change from the current direct vote of the people, and also some *1037 reference as to what the new method involves. However, so very often a description of things or concepts through words from the English language defies absolute precision. Such descriptions can be honestly expressed through the utilization of multiple and various words in many combinations. In the present context, the windows through which the word or words utilized should be measured are those of both one having legal training and the general Florida citizen. The eyes of a legal scholar should be applied to determine if, based upon application of such specialized knowledge, the effect or impact of the word or words used or omitted produces a result different from that as understood by Florida citizens, or causes some unrevealed outcome. The eyes of the average voter must be then applied to ascertain whether he or she can comprehend the true decision to be made by the vote. Semantics and linguistic distinctions will always complicate the analysis, but we cannot apply the view of either the legal scholar or the average citizen to the exclusion of the other. Most assuredly, this blending produces conflict at times, but such is the very nature of the English language which itself resists scientific precision. To be sure, this inevitable conflict is not based upon ill will or bad motives, but is simply inherent in the art of language and the eyes through which the words are understood.
I think it is important to note that if this Court were to invalidate the present ballot question, it has no authority to simply rewrite the question to be that which it deems "correct." Attempting to revert to the 1999 version of the ballot question as set forth in section 101.161(3)(c) and (3)(e), Florida Statutes (1999), would be disastrous, because such does not even give the public instruction that the "election" concept as to trial judges would be eliminated. Certainly, legal scholars would understand the current Florida system of "merit selection and retention," but, in my view, we have failed miserably in our attempts to help the average citizen of Florida understand the full process. Further, in a similar manner, I suggest that reverting only to words contained in the amended constitutional provision itself would, under existing law, properly suggest that the "election" methodology would be replaced, but would not further illuminate for Florida citizens what the "merit selection and retention" process would involve. I must conclude that a decision to invalidate the present ballot question, which would result in either of the foregoing alternatives, does not solve the alleged problem, but would merely substitute one concern for greater problems. Additionally, if judicial invalidation of the ballot question would result in the alternative that no ballot question would exist and, therefore, no submission of an issue to the electorate as mandated by the constitution would occur, we would be generating a totally unacceptable result. This alternative would thrust the Court unnecessarily and unacceptably into producing direct noncompliance with a constitutional mandate.
Stepping back from the present foray in attempting to understand and analyze the totality of the circumstances, I suggest that common sense directs that we must look back to and understand just what the people of Florida instructed through our organic law in 1998 when the constitutional provision which has generated this dispute was adopted. Although I concede that such election is over and in the past, we must understand its circumstances to understand the alternatives available today. All agree that the ballot summary presented to the electorate in 1998 made reference to the decision being whether to continue electing trial judges or adopting a system of having those judges appointed by the Governor subject to subsequent election concerning retention.[14] If one *1038 considers that which was presented to the electorate on the ballot for adoption in 1998 as an indication of what the citizens of Florida directed to occur during the 2000 general election, the inescapable conclusion is that the present ballot question is very similar to that ballot summary which was presented to the voters in 1998. There are certainly distinctions and differences, but in the final analysis, viewing a totality of the circumstances and all of the alternatives facing the people of Florida, the ballot question is not ambiguous or misleading so as to cause us to prohibit or forbid the question as presently phrased from being presented to the electorate as required by our organic law.
WELLS, C.J., concurring in result only.
I concur in result only because there is no basis for this Court to grant relief. However, my concurrence is not an indication that I find that this Court has jurisdiction in this case. To the contrary, I find no basis for mandamus, which is a writ limited to the enforcement of a clear legal right. See Florida League of Cities v. Smith, 607 So.2d 397, 400 (Fla.1992). Mandamus simply does not fit a situation where it is claimed that the Legislature acted unconstitutionally by placing on the ballot a referendum question framed with misleading or ambiguous language.
Furthermore, I do not agree with the concurring opinions contrasting this case with Armstrong v. Harris, 25 Fla. L. Weekly S656, ___ So.2d ___, 2000 WL 1260014 (Fla. Sept. 7, 2000), in concluding that Armstrong is an example of a case where this Court should strike ballot language that the Legislature has placed on the ballot and this case is an example of when this Court should not.
First, this case differs from Armstrong because this case does not involve a constitutional amendment proposed by the Legislature. This case involves the implementation of a provision of the constitution about which there is no question as to the provision's constitutional efficacy. Clearly, the only question here is whether the constitutional provision is self-executing. However, the provision does not frame a question. Thus, the power to frame the question, and thereby implement the constitutional provision, plainly rests with the Legislature. See Greater Loretta Improvement Ass'n v. State, 234 So.2d 665, 669 (Fla.1970).
Second, this case does not have even the same circular jurisdictional foundation as was the case in Armstrong and Askew v. Firestone, 421 So.2d 151 (Fla.1982). Both of those cases cite article V, section 3(b)(5), Florida Constitution, as their jurisdictional basis. Article V, section 3(b)(5), is this Court's "pass through" jurisdiction in respect to judgments of the circuit courts. Neither of those cases demonstrates any provision in article V, section 5(b), granting the circuit court jurisdiction in those cases.[15] Here, this petition does not even claim jurisdiction in the circuit court, but rather original jurisdiction in this Court.
Finally, I conclude that a comparison with Armstrong, which finds jurisdiction in this Court and then gives to this Court a basis to act in "clear cut" cases, demonstrates the fallacy of this Court's exercise of power in respect to referenda placed on the ballot by the Legislature without express constitutional authority to do so. What is claimed to be "clear cut" by a deeply divided court obviously is not.[16]
Decisions as to what is or is not misleading in most instances involve value judgments *1039 on the part of the decision-maker. For that reason, I continue to believe that separation of powers concerns should cause this Court not to exercise such jurisdiction on the basis of implied or inherent power.
NOTES
[1] See, e.g., Ray v. Mortham, 742 So.2d 1276 (Fla.1999) (refusing to invalidate constitutional amendment approved by voters limiting terms of state officials).
[2] As noted by Justice Ehrlich, such a finding has nothing to do with the good faith of the legislative drafters:

I do not intend to imply that the framers of the joint resolution and those members of the legislature who voted for it intentionally set out to mislead or deceive the voters. That is undoubtedly not the case. All I say is that the end result of their well-intentioned efforts was not in compliance with section 101.161, Florida Statutes (1981).
Askew, 421 So.2d at 158 (Ehrlich, J., concurring).
[3] Section 101.161 requires a ballot summary to be in clear and unambiguous language. By its terms, this statutory requirement applies to any constitutional amendment. Thus, this Court has held that a ballot summary of an amendment proposed by the Legislature cannot be misleading. See Grose v. Firestone, 422 So.2d 303 (Fla.1982); see also Advisory Opinion to the Attorney General re Term Limits Pledge, 718 So.2d 798 (Fla.1998) (striking a citizen initiative from the ballot because of misleading summary); Smith v. American Airlines, 606 So.2d 618 (Fla.1992) (removing a proposal of the Taxation and Budget Reform Commission from the ballot because of misleading summary).
[4] Indeed, the United States Supreme Court has applied the federal counterpart to this provision in a variety of contexts including, for example, a noncapital case in which the defendant was sentenced to life without parole for larceny, a crime ordinarily punishable by a maximum of five years imprisonment and a $5,000 fine. See Solem v. Helm, 463 U.S. 277, 284-85, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). Thus, the cruel and unusual standard of the federal constitution and the cruel or unusual standard of the state constitution may be implicated in the imposition of any punishment and in any case, whether it be a capital or a misdemeanor case.
[5] Fla. Const. Rev. Comm'n, Transcript of Proceedings 86-87 (Mar. 23, 1998).
[6] Fla. Const. Rev. Comm'n, Transcript of Proceedings 88 (Mar. 23, 1998).
[7] Of course, the Commission could have drafted the ballot language itself and required its use in the local elections, but, for whatever reason, it did not. Hence, the Legislature had to act since the amendment mandated action in the 2000 general election.
[8] Article V, section 10(b)(3)a., Florida Constitution (1999), provides:

A vote to exercise a local option to select circuit court judges and county court judges by merit selection and retention rather than by election shall be held in each circuit and county at the general election in the year 2000.
[9] The 1999 statute phrased the ballot question as follows: "Shall circuit court judges in the (number of the circuit) judicial circuit be selected through merit selection and retention?"

§ 101.161(3)(c), Fla. Stat. (1999). Section 101.161(3)(e) included the same language, but concerned county court judges.
[10] The stated purpose of the 2000 amendment is reflected in its legislative history:

The [1999] statute does not define what is meant by "merit selection and retention."
. . . .
Under this bill, the ballot language explains the merit selection and retention process rather than only using the phrase "merit selection and retention."
. . . .
... The amendment eliminated the phrase "merit selection" and rewrote the ballot question so that voters would choose between "election by a vote of the people" and "selection by the judicial nominating commission and appointment by the Governor with subsequent terms determined through a retention vote by the people."
Fla. H.R., Comm. on Election Reform, CS for HB 1955 (2000) Staff Analysis 3, 5-6 (Mar. 29, 2000).
[11] The Uniform Rules of Procedure for Circuit Judicial Nominating Commissions use the word "select" rather than "nominate." See, e.g., Section VI, entitled "Final Selection of Nominees" ("[T]he commission shall select no less than three nominees.... The names of such nominees selected by the commission shall be certified to the governor ....") (emphasis supplied).
[12] For example, because the Florida Constitution requires that proposed amendments and revisions be filed with the Secretary of State at least ninety days before an election, Justice Overton has urged the Legislature to enact a mechanism whereby interested parties may challenge ballot language within thirty days of the filing of the amendment or revision. See Askew, 421 So.2d at 157. Similarly, Justice Overton recommended that this Court create an expedited process to settle such challenges within thirty days of the challengers' filing. See id. He also urged that the Court's process provide for the correction of defective ballot language. See id.
[13] This is clearly distinguished from article V, section 10(a), Florida Constitution, which provides a specific ballot question concerning the issue of retention of appellate judges and justices.
[14] The 1998 ballot summary provided in pertinent part:

Provides for future local elections to decide whether to continue electing circuit and county judges or to adopt system of appointment of those judges by Governor, with subsequent elections to retain or not retain those judges; provides election procedure for subsequent changes to selection of judges....
[15] In my dissent in Armstrong, I wrote that I could find no basis for the judiciary to strike a constitutional amendment proposed by the Legislature. See id. at S661, at ___ (Wells, C.J., dissenting).
[16] See id. at S658, at ___.